**JOSEPH G. SANSONE**
**Vanessa De Simone**
**Assunta Vivolo**
**Barry O'Connell**
**Chevon Walker**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(917) 318-8572 (O'Connell)**
**oconnellb@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>    -against-<br><br>**Jason Peltz,**<br><br>        **Defendant.** | **COMPLAINT**<br><br>**20 Civ. \_\_\_\_\_ (      )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Jason Peltz ("Peltz" or "Defendant"), alleges as follows:

**SUMMARY**

1. This is an insider trading case involving Peltz's unlawful and highly profitable trading in the securities of Ferro Corp. ("Ferro"), a publicly traded chemical manufacturing company, and his illegal tipping of others to trade in Ferro securities.

2. On March 15, 2016, a news outlet reported that Ferro had received an acquisition offer from a private equity firm (the "Ferro News Report"). After the report, the price of Ferro's stock increased by nearly 5% and the volume of trading increased exponentially. Prior to the Ferro

News Report, Peltz obtained material nonpublic information about the private equity firm's interest in Ferro from a member of Ferro's Board of Directors (the "Ferro Insider"), and/or the Board member's fiancée (now wife) (the "Ferro Insider's Fiancée").

3. At the time that Peltz obtained the information, he was close friends with the Ferro Insider and the Ferro Insider's Fiancée. The Ferro Insider and the Ferro Insider's Fiancée were in direct contact with Peltz in the weeks surrounding Peltz's illegal trading in Ferro stock.

4. Rather than trade in a brokerage account in his own name, Peltz bought Ferro stock and options in the brokerage account of a New York-based associate (the "New York Associate" and the "New York Associate's Account"), as well as a U.S.-based brokerage account of an overseas entity (the "Overseas Entity" and the "Overseas Entity's Account"). Peltz also tipped, either directly or indirectly, at least five other associates to buy Ferro securities in their own brokerage accounts ("Traders 1 through 5").

5. As a result of Peltz's unlawful conduct, the seven brokerage accounts connected to Peltz through his trading or tipping of others received illegal insider trading profits of approximately $1 million. Approximately two weeks after the Ferro News Report, on March 30, 2016 and April 1, 2016, the New York Associate's Account made two transfers totaling $99,000 to an entity founded and partially owned by Peltz. On March 31, 2016, the Overseas Entity transferred nearly $1 million to a company controlled by the Ferro Insider.

## VIOLATIONS

6. By virtue of the foregoing conduct and as alleged further herein, Peltz has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)].

9. The Commission seeks a final judgment: (a) permanently enjoining Defendant, pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

11. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant may be found in, is an inhabitant of, or transacts business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including securities trading that was carried out from an address in Long Island City, New York.

## DEFENDANT

13. **Peltz**, age 37, is a resident of Long Island City, New York. He is the founder and former Chief Executive Officer of a Long Island City, New York-based company that produced a

music-based mobile computing application (the "Peltz Start-Up").

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

14. **Ferro** is an Ohio corporation headquartered in Mayfield Heights, Ohio that develops and produces performance materials for manufacturing companies, including pigments, performance colors and tile coatings. Ferro trades on the New York Stock Exchange under the symbol "FOE."

15. **Ferro Insider** served on Ferro's Board of Directors and maintained a residence in New York, New York during the months of February and March 2016 (the "Relevant Period").

16. **Ferro Insider's Fiancée** is a resident of New York, New York, and married the Ferro Insider in or around March 2016.

17. **New York Associate** resided in Oyster Bay, New York and had frequent phone communications with Peltz during the Relevant Period.

18. **Overseas Entity** is a British Virgin Islands entity that maintains a brokerage account in the United States. Two British citizens living outside of the United States are the authorized traders for the U.S.-based account of the Overseas Entity.

19. **Trader 1** resided in Oyster Bay, New York during the Relevant Period, at the same address as the New York Associate. The New York Associate and Trader 1 were domestic partners during the Relevant Period.

20. **Traders 2 and 3** are a married couple residing in Long Island City, New York. Trader 2 had frequent phone communications with Peltz during the Relevant Period.

21. **Trader 4** resided in the New York City area and was employed by the Peltz Start-Up during the Relevant Period. A brokerage account held by Trader 4's father purchased Ferro stock on February 23, 2016.

22. **Trader 5** resided in Cold Spring Harbor, New York and had frequent phone and

4

email communications with Peltz during the Relevant Period.  Upon information and belief, Trader 5 is a relative of Peltz.

## FACTUAL ALLEGATIONS

### I.     Peltz's Relationship with the Ferro Insider and the Ferro Insider's Fiancée

23.     During the Relevant Period, Peltz was close friends with the Ferro Insider and the Ferro Insider's Fiancée.  Between approximately January 2011 and May 2017, the Ferro Insider's Fiancée exchanged thousands of calls with Peltz and was one of Peltz's most frequent contacts.

24.     Peltz also had phone communications with the Ferro Insider during the Relevant Period.

25.     In late March, Peltz attended the Ferro Insider and the Ferro Insider's Fiancée's wedding, which took place on a private Caribbean island.  Prior to the wedding, Peltz assisted in the wedding planning by obtaining price quotes for a private jet to an airport near the island on which the event was held.

### II.    The Potential Acquisition of Ferro

26.     On or about February 2, 2016, representatives of a private equity firm (the "Private Equity Firm") met with Ferro's management and financial adviser to discuss a transaction between Ferro and the Private Equity Firm, including an acquisition of Ferro by the Private Equity Firm.

27.     On February 17, 2016, Ferro's Board of Directors held a meeting at its headquarters in Mayfield, Ohio.

28.     Upon information and belief, the Ferro Insider was present at this Board meeting, and the Board meeting included a discussion of the Private Equity Firm's interest in acquiring Ferro.

29.     As a Board member, the Ferro Insider had a duty of trust and confidence regarding Ferro's nonpublic business information, including the Private Equity Firm's interest in a transaction.

5

**III. Peltz's Phone Communications with the Ferro Insider and the Ferro Insider's Fiancée**

30. On the evening of February 17, 2016, after the Ferro Board meeting, the Ferro Insider called the Ferro Insider's Fiancée, and the call lasted for more than 23 minutes. The Ferro Insider and the Ferro Insider's Fiancée remained in phone communication in the following days.

31. In the days after the Ferro Board meeting, Peltz had phone communications with both the Ferro Insider and the Ferro Insider's Fiancée. In particular, the Ferro Insider's Fiancée and Peltz exchanged multiple calls on February 21, 2016, as reflected in the chart below:

| Caller | Recipient | Call | Time (ET) |
|---|---|---|---|
| Peltz | Ferro Insider's Fiancée | 02/21/2016 | 2:28 p.m. |
| Insider's Fiancée | Ferro Insider | 02/21/2016 | 5:53 p.m. |
| Peltz | Ferro Insider's Fiancée | 02/21/2016 | 6:00 p.m. |
| Insider's Fiancée | Peltz | 02/21/2016 | 6:22 p.m. |
| Peltz | Ferro Insider's Fiancée | 02/21/2016 | 7:00 p.m. |
| Peltz | Ferro Insider's Fiancée | 02/21/2016 | 9:10 p.m. |

32. In the days following February 21, the pattern of communication among Peltz and the Ferro Insider and the Ferro Insider's Fiancée continued, as reflected in the chart below:

| Caller/Texter | Recipient | Call/Text Date | Time (ET) | Texts |
|---|---|---|---|---|
| Peltz | Ferro Insider | 02/26/2016 | 4:55 p.m. | 2 |
| Peltz | Ferro Insider | 03/02/2016 | 12:18 p.m.-12:58 p.m. | 6 |
| Ferro Insider | Peltz | 03/02/2016 | 1:27 p.m. | n/a |
| Ferro Insider | Peltz | 03/04/2016 | 4:25 p.m. | n/a |

6

| Peltz | Ferro Insider's Fiancée | 03/04/2016 | 5:04-6:57 p.m. | 21 |
| Peltz | Ferro Insider | 03/08/2016 | 2:27 p.m.-2:49 p.m. | 9 |

33. During these phone conversations and other communications, the Ferro Insider and/or the Ferro Insider's Fiancée provided Peltz with material nonpublic information about Ferro, including the Private Equity Firm's interest in a transaction to acquire Ferro.

## IV. Peltz's Timely Trades in Ferro Securities

### A. Peltz Traded in the New York Associate's Account

34. On February 22, 2016—only three business days after the Ferro Board meeting, and the day after Peltz had numerous telephone calls with the Ferro Insider's Fiancée—Peltz began trading in Ferro securities, using the New York Associate's Account. At the time, Peltz was in regular phone communication with the New York Associate.

35. At approximately 9:08 a.m. that morning, an internet protocol ("IP") address registered to the Long Island City, New York address of the Peltz Start-Up (the "Peltz Start-Up IP Address") accessed the New York Associate's Account. An IP address is a unique identifier for a computer or other device that connects to the Internet.

36. On the morning of February 22, 2016, minutes after the Peltz Start-Up IP Address accessed the New York Associate's Account, the account began purchasing Ferro stock, accumulating 60,000 Ferro shares that day. The New York Associate's Account was also used to purchase options in Ferro stock. The New York Associate's Account had never previously traded in Ferro securities.

37. The New York Associate's Account continued purchasing Ferro stock and options on several days through March 15, 2016. The Peltz Start-Up IP Address was used to access the

7

New York Associate's Account before each of the Ferro stock and option purchases made by the New York Associate between February 22, 2016 and March 15, 2016.

38. Peltz and the New York Associate had numerous phone contacts around the time of these suspicious trades. For example, the New York Associate and Peltz exchanged multiple calls and texts on February 22, shortly after the purchases of Ferro securities in the New York Associate's Account on that day, including calls at 3:47 p.m. and 10:03 p.m.

**B.    Peltz Traded in the Overseas Entity's Account**

39. On the morning of February 26, 2016, the Peltz Start-Up IP Address accessed the Overseas Entity's Account.

40. The Overseas Entity's Account, a U.S.-based brokerage account, was approved for trading only four days before, on February 22, 2016, and was funded for the first time the day before, February 25, 2016.

41. The Overseas Entity's Account's authorized users are a father and son who are British citizens. Peltz had a relationship with at least one of the authorized users, the son.

42. On the morning of February 26, 2016, soon after the Peltz Start-Up IP Address accessed the Overseas Entity's Account, the Overseas Entity's Account began purchasing Ferro stock. In total, the Overseas Entity's Account purchased over 133,000 shares of Ferro stock that day. These purchases of Ferro stock on February 26 were the first trades made by the Overseas Entity's Account in any security.

43. The Overseas Entity's Account continued purchasing Ferro stock and options on various days until the morning of March 15, 2016. The Peltz Start-Up IP Address was used to access the Overseas Entity's Account shortly before each of the Ferro stock and options purchases made by the Overseas Entity's Account between February 26 and March 15, 2016.

## V. Peltz Tipped Traders 1 through 5 to Trade in Ferro Securities

44. Peltz provided others with material nonpublic information about Ferro, including the Private Equity Firm's interest in a transaction to acquire Ferro. Peltz knew, or was reckless in not knowing, that others would trade in Ferro securities on the basis of these tips.

### A. Peltz Directly or Indirectly Tipped Trader 1

45. During the same period when the New York Associate and Overseas Entity were purchasing significant quantities of Ferro stock and options after those accounts were accessed by the Peltz Start-Up IP Address, at least five other brokerage accounts held by individuals with a direct or indirect connection to Peltz also began purchasing Ferro securities.

46. On February 23, 2016, the day after the first Ferro trades in the New York Associate's Account, a brokerage account in the name of Trader 1, the New York Associate's domestic partner, began buying Ferro securities.

47. The New York Associate had authorization to trade in Trader 1's account and an email address associated with the New York Associate was used to communicate with the brokerage firm about Trader 1's account.

48. As noted above, on February 22, 2016 at approximately 3:47 p.m., the New York Associate called Peltz, and the call lasted more than thirty minutes. At approximately 10:03, p.m., the New York Associate again called Peltz, and the resulting call lasted nearly three minutes. The two also exchanged multiple texts on February 22, 2016.

49. The next day, February 23, 2016, the New York Associate called Peltz at 9:48 a.m., and the two spoke for approximately a minute. The New York Associate and Peltz also exchanged two, brief calls at approximately 11:25 a.m.

50. Later that same afternoon, Trader 1's account began purchasing Ferro stock and options. Trader 1's account had not purchased Ferro securities before that day. Trader 1's account

made additional purchases of Ferro stock and options on several days through March 16, 2016.

### B. Peltz Tipped Traders 2 and 3

51. On February 22, 2016—the same day as the first Ferro trades in the New York Associate's Account—accounts held in the names of Trader 2 and Trader 3, respectively, began purchasing Ferro stock.

52. Traders 2 and 3 are a married couple. Trader 2, the husband, communicated with Peltz in the months before this trade and, upon information and belief, maintained a close friendship with Peltz.

53. On February 22 at approximately 10:46 a.m., Peltz called Trader 2, and the call lasted for one minute and 35 seconds. At 10:52 a.m., a brokerage account held in the name of Trader 2 placed an order to purchase 500 shares of Ferro stock. At 10:56 a.m., a brokerage account in the name of Trader 3 placed an order to purchase 1000 shares of Ferro stock. Neither account had previously traded in Ferro securities.

54. Trader 2 and Trader 3's accounts continued purchasing Ferro stock later on February 22, 2016 and on subsequent days through February 25, 2016, in the case of Trader 2's account, and through February 23, 2016, in the case of Trader 3's account.

### C. Peltz Tipped Trader 4

55. On the morning of February 23, 2016, the day after the timely trades by the New York Associate's Account, Trader 2's account and Trader 3's account, a brokerage account held in the name of Trader 4's father also began purchasing stock.

56. At the time, Trader 4 was an intern at the Peltz Start-Up and, upon information and belief, worked in the same office space as Peltz. Trader 4 and Peltz later became roommates.

57. In a recorded call between Trader 4's father and the brokerage firm where his brokerage account is held, Trader 4's father indicated that Trader 4 had previously placed trades in

the father's brokerage account.

58. On February 22, 2016, at approximately 10:33 a.m., Peltz called Trader 4, and the call lasted more than eight minutes.

59. On February 23, 2016, at approximately 9:34 a.m., Trader 4's father's account placed an order to purchase 3000 shares of Ferro stock. Trader 4's father's account had never previously traded in Ferro securities.

### D. Peltz Tipped Trader 5

60. On February 29, 2016, Trader 5's brokerage account began purchasing Ferro options. Upon information and belief, Trader 5 is a relative of Peltz. During the Relevant Period, Trader 5 frequently communicated with Peltz by phone and email, including about various business ventures.

61. At approximately 3:47 p.m. on February 28, 2016, a phone number associated with Trader 5's employer called Peltz, and the call lasted more than 10 minutes.

62. The following afternoon, Trader 5's account purchased Ferro options.

## VI. Public Disclosure of Private Equity Firm's Interest in Ferro

63. On the evening of March 14, 2016, Peltz's phone number exchanged a series of calls with the Ferro Insider and the Ferro Insider's Fiancée.

64. The following morning, March 15, 2016, Peltz began placing calls to certain Ferro traders. In particular, Peltz called the New York Associate at 8:50 a.m. and Trader 2 at 9:19 a.m.

65. Shortly after Peltz's call with the New York Associate, the account held by Trader 1, the New York Associate's domestic partner, purchased an additional 1000 shares of Ferro stock at 9:33 a.m. Moments later, at 9:34 a.m., Peltz purchased an additional 2000 shares of Ferro in the Overseas Entity's account.

66. Less than ten minutes after these trades, a news outlet published the Ferro News

Report at 9:42 a.m., publicly disclosing for the first time that the Private Equity Firm was seeking to acquire Ferro.

67. Ferro's stock price immediately rose after the report, from an opening price of $10.76 to $12.76 at 9:42:42 a.m. Ferro's stock price closed the day at $11.38, a 4.7% increase from the previous day's close.

A. **Selling Following the Ferro News Report**

68. Immediately after the Ferro News Report's publication, several accounts in which Peltz traded and accounts held by individuals that he tipped sold substantial portions of their Ferro holdings. Certain of these trades were made within minutes of the Ferro News Report's publication.

69. For example, the Overseas Entity's Account sold 150,000 shares of Ferro stock at 9:42:42 a.m., less than a minute after the Ferro News Report was released. The Peltz Start-Up IP Address was used to access the Overseas Entity's Account shortly before these trades were placed. Additionally, one of the authorized users for the Overseas Entity's Account called Peltz approximately five minutes after the Overseas Entity's Account placed this trade.

70. Trader 1's account also sold Ferro stock less than a minute after the Ferro News Report was published, and less than an hour after Trader 1's domestic partner, the New York Associate, spoke to Peltz at 8:50 a.m.

71. Likewise, the New York Associate's Account and Trader 2's account sold Ferro stock on the date of the Ferro News Report.

72. After selling substantial portions of their Ferro holdings on March 15, 2016, the New York Associate's Account, the Overseas Entity's Account, Trader 1's account and Trader 2's account made additional sales on various dates through early May 2016. Likewise, the accounts held by Traders 3, 4 and 5 liquidated their Ferro holdings on various dates through early May 2016.

73. In total, the seven accounts linked to Peltz through trading or tipping received

approximately $1 million in illicit profits as a result of the Ferro trading.  The New York Associate's Account received at least $226,000 in illicit profits; the Overseas Account received at least $654,000; Trader 1 received at least $79,000; Traders 2 and 3 received at least $7,000; Trader 4 received at least $6,000; and Trader 5 received at least $11,000.

      **B.**      **Transfers from the New York Associate and Overseas Entity to Entities Associated with Peltz and the Ferro Insider**

74. Within days of the Ferro News Report, and no later than March 22, 2016, Peltz attended the wedding of the Ferro Insider and the Ferro Insider's Fiancée on a private island in the Caribbean.

75. On March 30, 2016, $39,000 was transferred from the New York Associate's Account to an entity co-owned by Peltz.  The next day, another $60,000 was transferred from the New York Associate's Account to the same Peltz entity.

76. The same day, one of the authorized users for the Overseas Entity's Account initiated a wire transfer of $1,000,000 from Overseas Entity's Account to a bank account held by Overseas Entity.  On March 31, 2016, Overseas Entity's bank account sent $999,904 to an entity owned by the Ferro Insider.

## CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

77. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76.

78. Peltz received information about a potential acquisition of Ferro that he knew, consciously avoided knowing, or was reckless in not knowing was material and nonpublic.

79. Peltz obtained this material, nonpublic information under circumstances where he knew, consciously avoided knowing, was reckless in not knowing, or should have known that the information was tipped to him in breach of a duty of trust and confidence for personal benefit, or

13

he misappropriated this information in breach of a duty of trust and confidence.

80. Peltz illegally used the material, nonpublic information to trade in Ferro securities, and to tip others to trade in Ferro securities using this information in exchange for, or with the expectation of receiving, a personal benefit.

81. The personal benefit from tipping here included obtaining a pecuniary gain in exchange for the material nonpublic information about Ferro and/or making a gift of material nonpublic information about Ferro to a close friend for securities trading purposes.

82. Peltz acted with scienter and intent to deceive or defraud.

83. By engaging in the conduct described above, Peltz directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

84. By engaging in the conduct described above, Peltz, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Peltz and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them, under Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], from violating, directly or indirectly, Exchange Act Section 10(b) and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

### II.

Ordering Defendant to pay civil monetary penalties under Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)].

### III.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
December 22, 2020

/s/ *Joseph G. Sansone*
_____
JOSEPH G. SANSONE
Vanessa De Simone
Assunta Vivolo
Barry O'Connell
Chevon Walker
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(917) 318-8572 (O'Connell)
oconnellb@sec.gov